UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDER ORENSHTEYN,

                           **Plaintiff,**

             - against -

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                         **Defendant.**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-16-13

**OPINION AND ORDER**

02 Civ. 5074 (JFK) (RLE)

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

Defendant International Business Machines Corporation ("IBM") has asked this Court to order Plaintiff Alexander Orenshteyn ("Orenshteyn") to re-submit his answers to IBM's contention interrogatories served on May 3, 2003, because, according to IBM, the answers Orenshteyn has already provided do not adequately identify which aspects of IBM's products Orenshteyn claims infringe his patents. More specifically, IBM asks the Court to strike Orenshteyn's Supplemental Response, served on May 12, 2003, because it is not specific and detailed enough to comply with this Court's May 5, 2003 Order and fails to provide IBM with sufficient information to defend this action. IBM also asks the Court to bar Orenshteyn from bringing new claims of infringement in this action which IBM argues were first raised in Orenshteyn's July 6, 2011 letter, and which could have been raised in 2002 when Orenshteyn originally brought suit.

For the reasons set forth below, IBM's application is **GRANTED**. Orenshteyn is **HEREBY ORDERED by January 31, 2013**, to re-submit his responses to the interrogatories

consistent with the directions herein.  The new responses shall not include products or claims first identified in July 2011.

## II. BACKGROUND

### A. The '942 and '569 Patents

U.S. Patent Number 5,889,942 ("the '942 patent"), titled "Secured System for Accessing Application Services from a Remote Station," is comprised of sixty-two claims, and was originally filed with the United States Patent and Trademark Office on December 18, 1996.  The patent was issued to Orenshteyn on March 30, 1999.  U.S. Patent Number 6,393,569 ("the '569 patent"), also titled "Secured System for Accessing Application Services from a Remote Station," was filed by Orenshteyn on March 29, 1999, and issued to him on May 21, 2002.  The '569 patent is a continuation, in part, of the '942 patent, and is comprised of twenty-six claims.  The patents purport to overcome a number of disadvantages contained in the prior art regarding the use and security of utilizing applications from remote servers.  They claim to resolve a common problem encountered by a personal computer user – continually having to upgrade hardware and software – which translates into high maintenance costs.   The patents also claim to address security risks that arise when files are stored in remote locations such as on a remote file server.  In addition, securing a computer's writable resources, such as the hard drive, can be compromised or damaged by rogue Java applets or other applications foreign to the desktop unit.

The patents address these problems primarily by bifurcating low-level interface and storage functions (which are done on the personal computer, or client station) and high-level application function (which is stored on a specialized remote application server).  The system lowers costs by reducing the need for powerful hardware and software locally since high-level

2

function is accomplished remotely. Further, server application programs do not need to be written to be specific to, or dependent upon, a particular operating system because the application logic is separated from the low-level logic of the client station, including the client operating system. As such, software developers need only create one version of the program instead of developing different versions for the various platforms on personal computers. The invention resolves the security problems in the prior art by enabling only selected, or restricted, access from the high-level application to the storage facilities on the client station, which ensures that no data ever resides permanently on the remote server. Instead, the data from the client station is read from, or written to, the local filing system within the client station depending on what is needed by the user and the high-level application.

## B. Facts and Procedural History

Orenshteyn filed suit against IBM on July 1, 2002, accusing IBM of direct and contributory infringement of his patents. In the Complaint, he alleged infringement of five claims (claims 1 and 14 of the '942 patent and claims 1, 12, and 23 of the '569 patent) and identified two alleged infringing products: IBM Lotus Sametime and IBM NetVista Thin Client. As of April 2, 2003, Orenshteyn had alleged infringement of four claims (claims 1, 14, and 56 of the '942 patent and claim 1 of the '569 patent) and four infringing products, adding IBM's Domino (with WebSphere) and Tivoli in response to IBM's contention interrogatories:

| Patent | Claim | Product | Pages |
|--------|-------|---------|-------|
| 942 | 1 | Sametime | 2-6 |
| 942 | 14 | Sametime | 7-8 |
| 942 | 56 | Sametime | 9-11 |
| 569 | 1 | Sametime | 12-6 |
| 942 | 1 | Domino | 17-21 |
| 942 | 14 | Domino | 27-28 |
| 942 | 56 | Domino | 29-31 |
| 569 | 1 | Domino | 22-26 |

3

| 942 | 56 | Tivoli | 37-38 |
|-----|----|--------|-------|
| 942 | 1  | Netvista | 39 |
| 569 | 1  | Netvista | 40 |

*See* IBM's Letter to the Court dated July 26, 2011 ("IBM's July 26 Let."), Ex. C. IBM

questioned the sufficiency of Orenshteyn's responses to its contention interrogatories.

Meanwhile, the Parties initiated the claim construction process and exchanged claim

construction statements on April 18, 2003, and rebuttal statements on May 2, 2003. On May 5,

2003, this Court ordered Orenshteyn to "provide defendant International Business Machines

Corporation ("IBM") with supplemental responses to IBM's Contention Interrogatories . . .

[which] shall include, for each limitation of each asserted claim, a specific identification of the

aspects of IBM's products that Orenshteyn contends meet the limitation and a detailed

explanation of how the limitation is met." May 5, 2003 Order, Docket No. 16.

On May 12, 2003, Orenshteyn supplied his Supplemental Response. IBM's July 26 Let.,

Ex. E. The Supplemental Response involved the same claims and products but provided

additional information concerning the bases for Orenshteyn's allegations. It consisted of two

columns. The first column referred to a portion of the patent at issue while the second purported

to describe the infringing aspects of the challenged product. For example, in describing how

Sametime infringes claim 1 of patent '942, Orenshteyn provided the following:

| Patent Claim | Infringing Product |
|--------------|--------------------|
| A secure system for accessing application services from at least one application program, comprising | The Lotus Sametime product enables a system for accessing application services from at least one application program. The Sametime product is comprised of the Sametime server, the client package, the online meeting center, the application development toolkits, and server |

4

| | |
|---|---|
| | administration tool. The application services provided by the Sametime product to the Sametime clients include, other user Awareness, Conversation, and Object Sharing. The services are also called Community Services, Meeting Services, Web Application Services, and Domino Services and include the Sametime Online Meeting Service.<br><br>      The system is enabled, as described herein, along with the specific limitations of claim 1. |

IBM's July 26 Let., Ex. E.  Similarly, Orenshteyn provided the following to describe how IBM's

NetVista infringed claim 1 of patent '942:

| | |
|---|---|
| at least one client station, having low-level application independent logics stored therein, and at least one controller for controlling said low-level application independent logics, said low-level application independent logics including a user interface logic, a device control logic for controlling devices, a file system logic, and a communication interface logic, wherein said file system logic includes a file system capable of storing data corresponding to said at least one application program; | (Only a portion of the claim is shown). IBM NetVista is advertised by IBM as a "thin client" models such as N2200, N2800, N70 are in the form of a personal computer with less functionality because the intent is to use it in connection with an application server in a system as claimed in claim 1. The IBM website has numerous examples of businesses using the IBM NetVista thin client with application servers. The thin client is well known in the industry today and typically is priced substantially less than a personal computer, because far less functionality is needed in the thin client. IBM even provides Citrix ICA client, software which enables the thin client to communicate with the application server. Thus, IBM is inducing the practice of the claimed invention, and is providing a thin client, which is intended to be used with an application server in an infringing manner. |

5

*Id.* No issues were raised with the Court by either party at the time the Supplemental Response was filed. Instead, the Parties agreed to stay the action pending the outcome of an appeal to the Court of Appeals for the Federal Circuit in similar litigation in the Southern District of Florida.

In the Florida action, Orenshteyn had sued Citrix Systems, Inc., a company that had worked on a project involving cloud computing with IBM. *See* Orenshteyn's Letter to the Court dated October 3, 2011 ("Orenshteyn's Oct. 3 Let.") at 9. Citrix moved for partial summary judgment, arguing that Orenshteyn did not meet his burden of proving infringement and that, even if Citrix's software did infringe the '942 patent, there was prior art that invalidated the '942 patent. Citrix also filed a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure. The district court granted Citrix's motion for non-infringement and partially granted its motion for sanctions. *See Orenshteyn v. Citrix Systems, Inc.*, 265 F. Supp. 2d 1323 (S.D. Fla. 2003); *Orenshteyn v. Citrix Systems, Inc.*, 558 F. Supp. 2d 1251 (S.D. Fla. 2008).

Orenshteyn appealed both decisions to the Federal Circuit, which consolidated them. The Federal Circuit reversed the district court's grant of summary judgment because it construed claim 1 of the '942 patent differently than the district court, specifically finding that the district court erroneously interpreted the word "controller" in the claim. It remanded the case to consider Citrix's invalidation argument and reversed the imposition of sanctions as an abuse of discretion. *See Orenshteyn v. Citrix Systems, Inc.*, 341 Fed. Appx. 621 (Fed. Cir. 2009). On remand, the district court partially granted Citrix's motion for summary judgment on the remaining claim of patent infringement, holding that prior art invalidated Claim 1 of the '942 patent. *See* IBM's Letter to the Court dated October 5, 2011 ("IBM's Oct. 5 Let."), Ex. L.

This case was subsequently reopened. *See* March 8, 2011 Order, Docket No. 29. Although the parties had agreed to submit an updated claim construction statement on July 15,

6

2011, and rebuttal claim construction statements on July 29, 2011, because of the present discovery dispute, no claim construction statements have been submitted.

On June 28, 2011, IBM wrote Orenshteyn a letter asking that he supplement his responses to its discovery requests, including the contention interrogatories. IBM's July 26 Let., Ex. F. IBM warned Orenshteyn that "unless [he] provide[d] supplemental contentions by Tuesday July 5 . . . [his] infringement contentions [would be] limited to those set forth in [the] May 12, 2003 Supplemental Responses." By letter of July 6, 2011 (dated June 30, 2011 on page 1), Orenshteyn's counsel informed IBM of his client's intention to challenge six newly identified products comprising twenty-five additional patent claims. The new products included Blueprint, BlueworksLive, Workplace Services Express, Websphere/Websphere Portal/Websphere Application Server, LotusLive Cloud Collaboration Platform, and IBM SPSS Decision Management (SaaS). Added claims for the '942 patent were claims 2, 3, 6, 7, 9, 11, 12, 15, 16, 17, 18, 19, 20, 21, 22, 28, 29, 57, and 58, and for the '569 patent, claims 7, 9, 10, 11, 25, and 26. IBM's July 26 Let., Ex. F. Orenshteyn, however, did not provide any information concerning the infringing aspects of the new products identified. After a series of submissions by the Parties and conferences with the Court, Orenshteyn was ordered to provide the same type of information for these new claims as he had included in the Supplemental Response to the May 2003 Order. On a rolling basis, Orenshteyn ultimately produced exhibits purportedly complying with this direction of the Court. For example, with respect to claim 1 of the '942 patent Orenshteyn contends that IBM products SPSS and CICS are application programs within a system which inappropriate infringes. *See* Ex. A to this Opinion.

IBM argues that Orenshteyn's responses in 2003 were iadequate and that his further responses in 2011 were both inadequate and inappropriate. Specifically, IBM maintains the

7

following.

     1. Orenshteyn's May 2003 Supplemental Response should be stricken with
respect to IBM's NetVista because he failed to comply with the Court's Order.

     IBM asserts that Orenshteyn failed to address all of the limitations of claim 1 of either

'942 or '569, the only claim alleged to be infringed by NetVista.  It contends that while

Orenshteyn supplies some general information about NetVista, he asserts conclusorily with

respect to both '942 and '569 that "IBM is inducing the practice of the claimed invention, and is

providing a thin client which is intended to be used with an application server in an infringing

manner." IBM's July 26 Let., Ex. E, at 39-40.  IBM argues that these generalized statements do

not comply with the Court's Order of May 5, 2003, because they fail to state with particularity

how NetVista infringes the specific claims of the patents.

     2. Orenshteyn should be precluded from asserting infringemnt as to any product
or claim not identified in the May 2003 Supplemental Response.

     In its first correspondence to the Court after the case had been reactivated, IBM pointed

out that Orenshteyn had provided no information with respect to the newly identified products

and claims. *See* IBM's July 26 Let.  It contended that this was a violation of the May 2003

Order and prejudiced IBM in preparing its defense in general and preparing for the claim

construction process in particular.  For his part, Orenshteyn maintained that the claims and

products newly listed in the July 6, 2011 infringement contentions should be included in the

present litigation because the alternative of filing a separate litigation would be a waste of the

parties' resources and a waste of judicial resources, and expressed a willingness to reassess the

then-current schedule to accommodate the addition of infringement contentions and to provide

IBM the opportunity to evaluate the new contentions.  Orenshteyn's Letter to the Court dated

August 1, 2011 ("Orenshteyn's Aug 1 Let.") at 2.

After conferencing with the Parties, the Court ordered Orenshteyn to include the newly identified claims of infringement and to provide the information called for in the May 2003 Order.  Orenshteyn submitted a response, but IBM maintains that the expanded charts produced by Orenshteyn are also inadequate.  They assert that the information submitted by Orenshteyn "appears to include nothing more than random quotes from IBM marketing material and/or paraphrases of the patent claim language. There is nothing to indicate that plaintiff compared any of the actual products to any of the asserted claims, as would be required for bringing suit on such products."  IBM's Letter to the Court dated September 27, 2011 ("IBM's Sept. 27 Let.") at 2.  Specifically, IBM argues that Orenshteyn does not explain how the different products are alleged to work together to satisfy any of the claim limitations.  With respect to SPSS and CICS, IBM states that Orenshteyn (1) does not identify an application server, *id.*; (2) does not identify the low-level user interface in the alleged infringing product, *id.*; and (3) does not describe how the application programs "selectively controls" the low-level appplication independent logics or "processes said corresponding data . . . without permanently storing said data." *Id.* at 3. Additionally, IBM contends that Orenshteyn "makes vague allegations regarding IBM products being combined or working together with other IBM products" but provided charts which referred to certain IBM software brands (e.g., WebSphere and Tivoli), which include hundreds of individual products, without identifying the products within the brands that are alleged to be combined. *Id.* Overall, IBM accuses Orenshteyn of changing the target, and introducing new claims and products every time he is given an opportunity to explain his position:

> Lastly, plaintiff's list of accused products continues to change. Plaintiff fails, in whole or in part, to address certain of the newly accused products. For example, plaintiff fails to provide *any* infringement contentions regarding "Lotus Live," instead it is only mentioned in the title bar and cover page of the SameTime chart (Exhibit D.). Conversely, plaintiff has now identified a number of IBM products

9

that had never previously been alleged to infringe. For example, plaintiff had previously made vague allegations regarding "WebSphere," a brand covering over 200 different products, but specifically identified only two, the WebSphere Application Server and WebSphere Portal products. Plaintiff has now, for the first time, identified at least four additional products within that brand (WebSphere Cast Iron Cloud integration, WebSphere DataPower Cast Iron Appliance XH40, WebSphere Cast Iron ypervisor Edition and WebSphere Cast Iron Live), providing only vague allegations as to each. (See Exhibit E at p. 1) Plaintiff had similarly previously accused and provided a claim chart for only one Tivoli branded product, the Tivoli Storage Manager. Now, for the first time, plaintiff appears to accuse at least two other products within the Tivoli brand: Tivoli Service Automation Manager and Tivoli Service Delivery Manager. (See Exhibit F at p. 1)

IBM's Sept. 27 Let. at 4.

Orenshteyn's Response

Orenshteyn points out that the Court struck the following language from IBM's proposed order: "and an identification of all evidence (including citation to specific pages, by bates number, of documents produced by plaintiff) supporting plaintiff's contentions as to that limitation." May 5, 2003 Order, Docket No. 16.   According to Orenshteyn, this meant that he was "**not** required to cite specific parts of the IBM software that satisfy the limitations." Orenshteyn's Oct. 3 Let. at 1 (emphasis included).  He maintains that his obligation at this point is to "set forth proper notice, identifying that which is accused of infringement."  Orenshteyn argues that at this pre-Markman stage he is not required to provide proof, but merely to give meaningful guidance to IBM of the matters in controversy.  More broadly, Orenshteyn maintains that IBM is feigning ignorance, and that it knows full-well how the challenged products operate and how they are alleged to infringe:

> The charts must also be read in context and be evaluated based upon the audience for the charts.  These charts are not for presentation to a lay jury or a party without knowledge of their own software.  Nor do they represent the expert report on infringement.  The recipient of this notice is IBM, the maker of the

10

> accused software.  IBM is presumed to know how the software
> identified works and how the different aspects of its software
> identified by Orenshteyn operate.

Orenshteyn's Oct. 3 Let. at 2.  In Orenshteyn's view, the citation to IBM's public materials is not

a weakness, but a stark affirmation of the basis for his belief that the challenged products contain

the infringing aspects.

### III.  DISCUSSION

In its basic form, this application by IBM presents the question, "Has Orenshteyn

complied with the Court's May 2003 Order?"  On one level, it is a simple question, and the

simple answer is, "No."  At least with respect to the Court's expectations, the Supplemental

Response in 2003 and the further response in 2011 do not provide the detail required by the

Order.  The Court had expected that Orenshteyn would indicate how the various components in

IBM's products acted to infringe his patents.  The 2003 Order, however, occurred in the context

of communications issue with Orenshteyn's counsel, and the 2011 supplement occurred in the

context of a change in his counsel.  In 2003, responses from Orenshteyn during conferences were

not providing clarity concerning his position, and IBM had submitted a proposed order. While

the Court determined that Orenshteyn was not providing appropriate responses concerning his

allegations of infringement, the proposed order overstated his obligations at that stage.  As a

result, the Court struck a portion of the proposal.  In 2011, a new set of problems presented

themselves.  Orenshteyn's new counsel was hampered in responding to the Court's inquires

concerning the adequacy of the interrogatory responses.  Having reviewed the more recent

submissions of the Parties, the Court has determined that a closer look at the sufficiency of

Orenshteyn's responses is warranted.

As an initial matter, the language stricken by the Court in 2003 was not meant to limit the

11

level of specificity in Orenshteyn's response.  Rather, IBM's proposed order simply went too far when it sought to have Orenshteyn identify "all evidence . . . supporting plaintiff's contentions." This was not only inappropriate for responses to contention interrogatories, but exceeded the requirements of a Markman hearing.  Orenshteyn was, however, ordered to identify which aspects of the challenged products were alleged to infringe his patents.  To the extent that Orenshteyn was alleging contributory infringement, the order required him to indicate how a particular component interacted to contribute to infringement.  The stricken portion of the proposed order was not meant to relieve Orenshteyn of the need to be specific, but only to make clear that he was not required to meet the standard of proof for summary judgement or to present the quantum of evidence needed to prevail at trial.  He was required to provide IBM and the Court with a clear and concise statement of the connection between his patent and the products produced by IBM.

**A.     Orenshteyn's assertion that IBM knows its own products and should be able to understand why they infringe is not supportable.**

Orenshteyn takes the position that his responsibility with respect to the contention interrogatories is akin to notice pleading, and that he "need only show where the [elements] are [found] in the accused device."  Orenshteyn's Letter to the Court dated October 13, 2011 ("Orenshteyn's Oct. 13 Let.") at 3.  Under this approach, once he had identified the target(s) of his accusations, IBM has sufficient knowledge of its own products to supply any missing information about infringement.  Thus, Orenshteyn asserts that his system comprises four components: "(I) server (ii) client station (iii) network software (iv) application software." Orenshteyn's Oct. 3 Let. at 3.  According to Orenshteyn, the "IBM COMBINATION CHART" explains that IBM engages in direct infringement when it supplies the four components.  And

12

when IBM sells one or more of these components separately, there is contributory infringement because they contribute one or more parts of an infringing system. Thus, IBM SPSS Decision Management (SaaS) and CICS Explorer and CICS Explorer with Eclipse are indirect contributory infringing products because they are applications, and satisfy component "(iv)." Orenshteyn is thus able to capture the wide-ranging IBM products accused because many of them fit into one of the categories encompassed by the patent:

> As clearly set forth [in] all of the charts, there are four elements to the system (i) server satisfied by IBM server hardware, firmware or virtual machines (ii) client stations satisfied by a PC, laptop, tablet, PDA, Cell phone, NetVista Thin client, etc. (iii) network software, Websphere or Domino or Tivoli or Workplace Services Express (part of IBM Workplace Collaboration Services) or IBM Applications on Demand and (iv) application software Blueprint, BlueworksLive, Lotus Sametime, LotusLive Cloud Collaboration Platform, IBM SPSS Decision Management, CICS Explorer and any other IBM user software that is delivered as a service.

Orenshteyn's Oct. 3 Let. at 3-4. Accordingly, he may rely on IBM's own marketing materials because those materials describe which products constitute the various infringing components.

Orenshteyn is only partly correct, and his position might have some traction if this were the beginning stages of the litigation. But even then, Orenshteyn must do more than merely give notice. Generally, a plaintiff's obligation prior to filing suit and in responding to contention interrogatories exceeds the requirements of Rule 8 notice pleading. *See McZeal v. Sprint Nextel Corp.*, 501 f.3d 1354, 1356-57 (Fed. Cir. 2007). In *McZeal*, the plaintiff had alleged that defendant infringed his service mark INTERNATIONAL WALKIE TALKIE. The district court granted a motion to dismiss for failure to state a claim because the plaintiff didn't present "any facts." *Id.* at 1355. The Federal Circuit reversed:

> At this stage in the litigation, all McZeal has access to Sprint Nextel's public statements and advertisements. From this information, he has fashioned his complaint. In this case, *the*

13

*specifics of how Sprint Nextel's purportedly infringing device*
*works is something to be determined through discovery.*

*Id.* at 1358 (emphasis added). Consequently, Orenshteyn did not run afoul of his obligations by

relying on IBM's marketing materials when he filed his Complaint because at the onset of the

litigation, he could not have been expected to have complete working knowledge of the software

or hardware involved without access to the challenged products. As the litigation progressed,

however, his obligations matured. During discovery, he had the opportunity to gain adequate

knowledge of the challenged products to articulate how they infringe his patents. His failure to

do so cannot be cured during the Markman hearing process. The Markman hearing is not

designed to provide particularity with respect to the mechanism of infringement, but simply to

clarify the terms used in the patent and in the alleged infringing products.

    Orenshteyn cannot avoid this problem by invoking the contributory infringement

provisions of 35 U.S.C. § 271(c).[1] Unlike direct infringement, which does not require knowledge

of the patent or any intent to infringe, indirect infringement can only arise when the accused

indirect infringer has at least some knowledge and intent regarding the patent and the

infringement. In a typical case, contributory infringement is triggered when a seller provides a

part or component that, while not itself infringing of any patent, has a particular use as part of

some other machine or composition that is covered by a patent. If there are other valid uses for

the product, however, or it is "a staple article or commodity of commerce suitable for substantial

noninfringing use," the seller has likely not contributed to a third party's infringement under 35

---

[1] Contributory Infringement is defined: "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." 35 U.S.C. § 271(c).

U.S.C. § 271(c).  Thus, Orenshteyn cannot simply indicate that an IBM product satisfies one of the elements of his patent, he must explain how it has a particular use as part of the infringing system.  If he has failed to secure this information during the discovery process, he must bear the burden of his lack of knowledge.

In sum, Orenshteyn focuses on the wrong question.  It does not matter that IBM knows how its products *work*; Orenshteyn must indicate how they *infringe*.  Because the patent involves a process, Orenshteyn need not provide an in-depth analysis of computer code but he must define the infringing aspect.  Orenshteyn has largely focused on the product functionality, but not how they infringe his patents.

IBM argues that Orenshteyn, "provides no explanation of how the different products are alleged to work together to satisfy any of the claim limitations."  *See* IBM's Sept. 27 Let. at 2. Orenshteyn responds that IBM has willfully ignored those portions of the charts that provide IBM with notice of how the products work together.  *See* Orenshteyn's Oct. 3 Let. at 2.  He also claims that IBM has ignored the "IBM Combination Chart," *see* IBM's Sept. 27 Let., Ex. C, which demonstrates direct infringement by IBM when all four components are supplied together, and contributory infringement when only one component is sold at a time.  *See* Orenshteyn's Oct. 3 Let. at 3.  IBM argues that the Combination Chart does not provide information about how the allegedly infringing products work together to embody the patented system, that it incorporates products recently sold to another company by IBM, and that it includes products that were not introduced or acquired by IBM until 2009 or later.  *See* IBM's Letter to the Court dated October 5, 2011 ("IBM's Oct. 5 Let.") at 3-4.  Because this Court agrees that the IBM Combination Chart did not address the "how," as required by the 2003 Order, Orenshteyn must address this deficiency by further supplementation.

15

In his first contention chart, Orenshteyn highlights aspects of IBM products SPSS and CICS that allegedly infringe Claim 1 of the '942 patent, specifically, SPSS Decision Management (SaaS) and CICS Explorer (along with CICS Explorer with Eclipse). He characterizes these IBM products as "process and management software packages which can be used in a collaborative manner over a local or cloud based network in a software as a service model or an 'application on demand.'" *See* Ex. A, Chart 1. Even more specifically, Orenshteyn identifies those aspects that are used in a collaborative manner over a network.

The first limitation of Claim 1 of the '942 patent is "[a] secured system for accessing application services from at least one application program . . ." U.S. Patent No. 5,889,942, cl. 1. Orenshteyn explains that the claimed system has four parts, (i) a server, (ii) a client station, (iii) network software, and (iv) application software. *See* Orenshteyn's Oct. 3 Let. at 3. The SPSS and CICS products by IBM satisfy part (iv) of the system (the application software), and, when used in combination with other IBM products, Orenshteyn contends that Claim 1 of the '942 patent is directly infringed. Each product utilized individually then, makes IBM liable for contributory infringement. Orenshteyn specifically states in the SPSS and CICS Chart (Ex. A) that the products identified must be used in conjunction with other IBM products in order to comprise the entire "secured system" limitation of Claim 1 of the '942 patent. He therefore incorporates other contention charts for additional (and specifically identified) IBM products.

The second limitation of Claim 1 of the '942 patent describes one component of the secured system, namely, "at least one client station having low-level application independent logistics stored therein and at least one controller for controlling said low-level application independent logistics . . ." U.S. Patent No. 5,889,942, cl. 1. IBM claims that Orenshteyn, "*admits* that '[t]he client station is *not* part of the IBM SPSS Decision Management (SaaS) and

16

CICS software.'" *See* IBM's Sept. 27 Let. at 2 (emphasis in original). This characterization of Orenshteyn's response appears to be an attempt to distort the obvious point that utilization of Orenshteyn's patent (and IBM's software) requires a customer or user at a computer terminal ("the client station") accessing application services in order to complete the system.

Orenshteyn notes this when he explains, "[o]f course there is no description of how the SPSS or the CICS *software* can be a client station *hardware*, because it is not a client station." *See* Orenshteyn's Oct. 3 Let. at 3 (emphasis in original). In this respect, IBM simply mischaracterizes Orenshteyn's argument. SPSS and CICS are not being challenged as comprising the entire system, and there is no claim that they are client stations, in whole or in part. Orenshteyn "admits" that these applications must be used with other products but asserts that they work with these other products in a contributory infringing manner.

As for IBM's second argument concerning the client station limitation, it seems clear to the Court that the requirements within the limitation ("low-level application independent logistics," "controller," "user interface logic," "device control logic," "file system logic," "communication interface logic," "file system," and "data corresponding to at least one application program") all apply to the client station, *not* to the specific products highlighted by Orenshteyn in the SPSS and CICS Chart. The alleged deficiencies highlighted by IBM appear to be an attempt to undermine Orenshteyn's claim of compliance with the May 5, 2003 Order.

The third limitation of Claim 1 of the '942 patent is, "at least one application server having high-level application logic stored in a server device for running said at least one application program, said server device being coupled to said at least one application server." Orenshteyn explains that the "specialized remote application server" runs the corresponding application program. U.S. Patent No. 5,889,942, Summary of the Invention.

17

IBM argues that the contention chart does not identify the server that hosts SPSS or CICS and therefore does not satisfy the burden of specificity outlined in the May 5, 2003 Order. *See* IBM's Sept. 27 Let. at 2. Orenshteyn responds by arguing, "the SPSS and the CICS are software, they are not a server and therefore do not satisfy the server element alone, only in combination which is fully described in a different chart. There is no requirement at all for any application software in this element." Orenshteyn's Oct. 3 Let. at 4.

By writing "[t]he IBM SPSS Decision Management (SaaS) and CICS software are hosted on [an] IBM server," *see* Ex. A at 2, Orenshteyn is simply noting that IBM software is hosted on a server instead of the client station. IBM correctly points out that this specific component of the contention chart could have been stated more clearly. However, the role of the component is clear, and IBM's criticism misses the mark. Orenshteyn must identify how the server works in the infringing system, not which particular server is used.

The contention charts are not, and need not be, proof of the alleged infringement  On the other hand, they should have provided IBM with sufficient information concerning what aspects of IBM's products allegedly infringe Orenshteyn's patents.  IBM cites *Shared Memory Graphics LLC v. Apple Inc.*, 2011 WL 3878388 (N.D. Cal. Sept. 2, 2011) as an example of when a court has precluded infringement claims where a patent owner fails to provide sufficiently detailed infringement contentions at the discovery stage. *See* IBM Oct. 5 Let. at 3.  In *Shared Memory*, the Court found that the plaintiff's infringement contentions were so vague and conclusory that they invited the Court to assume the existence of certain claim limitations within the allegedly infringing products.  Further, because the litigation was removed to the Northern District of California, local patent rules governing infringement contentions were in effect.  The Southern District has no such local patent rules in place here. *See generally* S.D.N.Y. Local Civ. R.

18

(2012), *available at* http://www.nysd.uscourts.gov/rules/rules.pdf.

## B.   Amending infringement contentions

IBM has requested that the Court bar Orenshteyn's new claims raised in letters and the

new infringement contentions because IBM argues that they could have been raised at the time

Orenshteyn originally brought suit in 2002. Although interrogatories are helpful in patent

litigation because they help to focus the issues, this benefit "can often be swamped by premature

use of contention interrogatories that waste the parties' efforts before meaningful responses can

be developed based on completion of fact and expert discovery." Peter S. Menell, Lynn H.

Pasahow, James Pooley & Matthew D. Powers, <u>Patent Case Management Judicial Guide</u>

(Federal Judicial Center, 2009) at 4-4.  Even in jurisdictions such as the Northern District of

California that have local rules that govern infringement contentions, there are instances when a

required claim chart may be amended to add new claims. "Under Rule 16-9(c) [now Local

Patent Rule 3-1 (infringement contentions) and 3-6 (amendments to contention charts)],  the

patentee may amend its claim chart: (1) on stipulation of the parties; (2) upon a showing of

excusable subsequent discovery of new information; or (3) upon a showing of clearly excusable

neglect." *Genentech v. Amgen, Inc.*, 289 F.3d 761, 773 (Fed. Cir. 2002).

Orenshteyn, however, cannot meet this standard.  He has failed to conduct adequate

discovery, and the Parties should be preparing for Markman proceedings.  There is no discovery

awaiting, no new information requested of IBM relevant to the contention interrogatories.  No

deficiencies in Orenshteyn's knowledge can be characterized as "excusable." Orenshteyn

indicates that IBM had notice that he had other potential claims of infringement.  As early as

2002, he believed that there were other IBM products, besides Lotus Sametime and Net Vista,

which infringed the patents at issue.  In an email to IBM's counsel, Jeffrey T. Zachmann, dated

July 1, 2002, Orenshteyn's former counsel David Fink wrote, "[o]ther infringing IBM software products which are manufactured, offered for sale, and sold by IBM include Tivoli, Domino, and Websphere." Fink also noted in the email that the Complaint was filed mentioning only Net Vista and Lotus Sametime to stress their position with respect to their June 2002 meeting. *See* Docket No. 15.

However, as discussed above, this is not an issue about notice. Orenshteyn was required to do more than make references to other IBM products. He had to indicate with adequate detail why those products are subject to challenge in this lawsuit. As it stands now, there is no clear statement from Orenshteyn which allows either IBM or the Court to distinguish between products which infringe and those which do not.

**C.     Claims Added by Orenshteyn in 2011.**

Finally, Orenshteyn argues that "[i]f new products are excluded, [he] will simply file a new litigation and [the Parties] can try the same issues twice or consolidate." Orenshteyn Let. to IBM dated July 6, 2011 ("Orenshteyn July 6 Let.") at 1. He maintains that "[t]his would be an inefficient use of resources." *Id.* He assumes, of course that he will prevail on his theory of liability. Presumably he will not continue to press claims against other IBM products if the Court rejects his view that the wide-range of component products is subject to the infringement laws.

The discovery in this case has been difficult, contentious, and prolonged. Adding the additional products will most likely result in further delay. If IBM prevails, there should be little subsequent litigation. If Orenshteyn prevails, any subsequent litigation should be more focused and streamlined. The Parties may yet fulfill the promise alluded to when the case was stayed pending the Florida litigation.

### IV.  CONCLUSION

For the foregoing reasons, IBM's application is **GRANTED**.  Orenshteyn is **HEREBY**

**ORDERED by January 31, 2013**, to re-submit his responses to IBM's contention

interrogatories as required by the Court's May 5, 2003 Order.  He should strive to present these

responses in plain English.  The re-submitted responses shall not include products first identified

in Orenshteyn's July 2011 letter.


**SO ORDERED this 15th day of January 2013**
**New York, New York**

The Honorable Ronald L. Ellis
United States Magistrate Judge

**EXHIBIT A**

| U.S Patent No. 5,889,942<br>Claim 1 | ACCUSED PRODUCT SPSS & CICS |
|---|---|
| A secured system for accessing application services from at least one application program, comprising: | IBM SPSS Decision Management (SaaS) and CICS Explorer and CICS Explorer with Eclipe are process and management software packages which can be used in a collaborative manner over a local or cloud based network in a software as a service model or an "application on demand." While they are not the system, they are each an "application program" on the system. Therefore, the Websphere claim chart, Tivoli and the Domino Charts are incorporated herein by reference as if fully set forth.<br><br>IBM Applications on Demand "pay-as-you-go services infrastructure and application management services for SAP, Oracle, PeopleSoft, and Lotus. Simplify the management of enterprise applications through a fully-configurable set of usage- priced application hosting services, IBM Applications on Demand can help you reduce your costs by up to 50%.  You pay-as-you-go for these services – helping to speed returns on investment by reducing up-front project and infrastructure costs."<br><br>IBM Cloud Computing Overview. "The world is changing. A new reality is emerging for organizations of every size from every part of the planet. It's called the cloud – a profound evolution of IT with revolutionary implications for business and society, creating new possibilities and enabling more efficient, flexible and collaborative computing models. IBM is helping clients excel in cloud computing, providing secure and reliable Software as a Service (SaaS), Platform as a Service (PaaS), and Infrastructure as a Service (IaaS) solutions."<br><br>"Employing both predictive models and business rules to generate recommended actions, IBM SPSS Decision Management provides a "closed loop" system, feeding the results of today's interactions into the models that recommend and drive tomorrow's."<br><br>"With three simple clicks, business users can build a predictive model within a configurable web browser interface, and run simulations and "what if" scenarios that compare and test the best business outcomes – before deploying the model into an operational system."<br><br>INDUCING INFRINGEMENT:<br>"The IBM Collaboration Agenda approach can help organizations |

i

| | develop a strategy and a road map to discover the solution that best fits their budget, their current environment and the way they work. The IBM Collaboration Agenda approach consists of a series of no-cost workshops that can show users how collaborative technology can break down organizational silos, geographic boundaries, functional divisions and information overload. We can show you how on-premises computing, cloud-based computing and a hybrid environment with both provide new ways to enhance productivity, connect people to each other and to information, and more efficiently and effectively solve business problems." |
|---|---|
| at least one client station having low-level application independent logics stored therein and at least one controller for controlling said low-level application independent logics, said low-level application independent logics including a user interface logic, a device control logic for controlling devices, a file system logic, and a communication interface logic, wherein said file system logic includes a file system capable of storing data corresponding to said at least one application program; | The client station is not part of the IBM SPSS Decision Management (SaaS) and CICS software. |
| at least one application server having high-level application logic stored in a server device for running said at least one application program, said server device being coupled to said at least one application server, and. | The IBM SPSS Decision Management (SaaS) and CICS software are hosted on a IBM server. |
| a low-level interface between said at least one client station and said at least one application server for connecting said at least one client station to said at least one application server, | The IBM SPSS Decision Management (SaaS) and CICS software are implemented through browsers, which communicate over low-level interface. |

ii

| | |
|---|---|
| wherein upon accessing by said at least one client station, said at least one application server runs said at least one application program, which selectively controls said low-level application independent logics for controlling devices of said at least one client station and for accessing data of said at least one client station, and wherein said at least one application server processes said corresponding data from set at lease one client station on said at least one application program without permanently storing said data in a server device coupled to said at least one application server. | The IBM SPSS Decision Management (SaaS) and CICS software are accessed by the client station from the application server on which they reside and control the client station, accepting data providing output to the client station and storing and accessing information, data and files. |

iii